Peck, J.,
dissenting.
I am of opinion, under the circumstances shown by this record, that the contracts for the building of boats and vessels, stated as the foundation of this claim, were not authorized, and are not obligatory upon the United States.
I also think the claimant is precluded, by his submission to the Holt- *88 Davis commission, the acceptance of its finding, and the receipts given in satisfaction, from all right to a further recovery.
It has been the policy of the government for many years to invite proposals for all structures, supplies, &c., required for its use, by advertising therefor, whenever “ the public exigencies do not require the immediate delivery of the article or articles, or performance of the service;” but when an immediate delivery is necessary, the articles or service required may be procured by open purchase or contract at the places and in the manner in which such articles are usually bought and sold, or such services, engaged between individuals. It is also directed (Brightley’s Digest, vol. 2, p. 93) that no contract or purchase shall he made, unless the same be authorized by law, or under an appropriation adequate to its fulfilment, except for clothing, subsistence, forage, fuel, quarters, or transportation; which are not to exceed the necessities for the current year. (See Opinions of Attorneys General, vol. 2, p. 257; vol. 3, p. 437; vol. C, p. 407; vol. 9, p. 407.)
Thus has the law-making power been assiduous to protect the public against a want of vigilance in its agents.
The contracts involved in this controversy do not come within any of the statutory exceptions. No immediate delivery was expected or exacted; and although the vessels to be built were expensive, no appropriation adequate to the fulfilment of the contracts or otherwise had been made.
It was assumed on the argument, with great apparent confidence, that General Frémont had been invested with such plenary powers when placed in command of the department of the west, that he might either suspend or revoke the law at his pleasure, and therefore, in his department, contracts should be held obligatory whether made conformably to law or not. To support this view, his own testimony is put in the record, from which it seems he had much the same conception of his powers; for he says he was expected and authorized to exercise any and whatever power was necessary, in his opinion, to carry out the work he was sent to accomplish, without regard to the limits conferred by his commission. These opinions of his powers he says he derived from conversations with the President, the Secretary of War, and the Postmaster General, and the reason he gives for this peculiar conclusion, was that none of these officials used any expression which implied a restriction of power; on the contrary, he says the drift of the conversation with them was to the effect that he should exercise any power required. These opinions, he added, gathered strength from' the fact that he had heard that the President had *89 said tliat be, Frémont, bad more power tban the President himself possessed.
These delusions, which seem to have impressed General Fremont, are not of importance, except as explanatory in some degree of the ■irregularities which this record exhibits, connected with these contracts; which it is assumed derive their vigor from the exercise of his great powers. I cannot admit the authority of the three officials named, acting separately or in conjunction, to confer power on any individual■, no matter what his rank, beyond what the law authorizes. They could no more give a General, control over the law, than they could give him control over the tides, or make him “ague-proof.” The law commands, the officer executes. The established and recognized distinctions between the functions of legislative and executive powers are too precious and vital to be easily displaced. They are our guides and protection, and upon them depends in a great measure the safety of our institutions. The only exception to the supremacy of the laws is in the face of contending armies, where the contest is proximate and the exigency imminent. It is the contact and peril, not the pomp of war, that makes the law silent. When the danger is distant, when what is needed to be done can be accomplished in conformity to law, its mandates must be observed, or the obligation attempted to be created without such observance, and which the law is invoked to enforce, may be found defective under its tests.
No emergency is shown to have existed for the construction of these vessels which would justify an omission to advertise, inviting competition for that object. I do not discover any reason in the record, why the several vessels built by claimant could not have been got ready in as good time as they actually were, without any departure from the rules and regulations which the law prescribes.
It is insisted that the law which requires public notice before contracts can be made, is merely directory to the officers, and does not affect the validity of the obligation. The government necessarily conducts all its business by the instrumentality of agents, who derive their powers from the law, which is their only authority; and whoever deals with them must take notice that they have no other warrant than what the law confers, and that whenever the law is transcended, their action is null. Why should not the rules which govern agencies apply equally to public and private agents? In transactions between individuals, whoever deals with an agent is bound to see that he acts within the scope of his authority, if he desires that the principal shall be held; and I see no reason for excusing a party from using equal diligence *90 when he negotiates with an agent of the public. The fact that an officer may be in some way punished for not obeying the directions of the statutes, when he is acting for the government and involving it in pecuniary liabilities, would be but a poor equivalent for the losses he may occasion. The intention of Congress in prescribing rules for the transaction of the business of the government, and giving directions in that regard, was rather to protect the public and establish safeguards for the treasury than to punish delinquent officers, against whom the same statutes declare no punishment nor fix any penalty.
The citizen, who for his own gain co-operates with an officer in making a contract which is not in conformity to law, should not be permitted to shield himself, and claim not only immunity, but profit, by interposing the officer as an appeasing sacrifice to the law. When both have been delinquent participators in an unauthorized transaction, the citizen cannot excuse himself by saying, “ True, j'our agent has contracted with me in your name, in disobedience of public law, of the existence of which I am not permitted to be ignorant. Punish his transgression as much as you please, but nothing must be done to prevent my receiving the full benefit of our joint wrong-doing.” This would indeed be softening the way of one of the transgressors in a manner incompatible with reason and justice. The statutes regulating the making of contracts, in my opinion, are alike obligatory upon the citizen and the officer; prohibitory, as well as directory to both; a warning as well as a caution; and the fruits of the disobedience of them should not be all sweetness to one, and all bitterness to the other.
The Quartermaster General had advertised for proposals for the building of some of these boats, and this claimant made his bid, which was referred to General Fremont, not that he should close a contract, but that he should “ communicate with the War Department, and take such action as might be decided upon.” Instead of communicating with the War Department, as he was requested to do, General Fré-mont accepted a different proposal, which added largely to the cost of each boat, increasing the expense beyond what was originally contemplated — no competition having been invited by him for the construction of boats on the new plan, notwithstanding the increase of cost. The new proposal was by General Fremont referred to his quartermaster, with a direction to have more formal papers prepared, which was not done. The claimant, nevertheless, proceeded to build the boats, and does not explain why he did so, without obtaining the “ more formal papers,” otherwise than by showing that the quartermaster who was *91 directed to prepare them, declined the duty, and referred him to another, who, in his turn, failed or refused to act.
Another peculiar feature of this transaction, is that the number of boats to he built under it was to be at the discretion of General Fremont, not to exceed thirty-eight in all j and although it was never indicated how many of these boats were required, the claimant proceeded to build the largest number.
Similar difficulties attended the execution of the contracts for the tug-boats. No quartermaster was willing to execute any of them. Contracts were prepared for execution by claimant or some other person, but they remained incomplete in spite of the orders from General Frdmont that they should be executed, which order it is to be observed, was obtained long after the work was commenced.
The statement of these numerous irregularities, which are not by any means all that might be presented, furnishes abundant reasons why the claimant should ask, as he did, when seeking for redress, that the commissioners before whom his claim was pending should deal liberally with him. His claim was not liquidated, depending upon computation to fix the amount due, but it was involved in uncertainty and doubt. No one of the numerous contracts upon which his demand rested had been executed. Work had been done and materials furnished by claimant, and he had received money on account, hut the sum to be paid him as the balance due rested in uncertainty, and was to be determined upon just and equitable principles. Some of the tug-boats, it appears from the certificate of Quartermaster Turuley, were actually completed and delivered not only before contract executed, hut before any order was obtained even for the execution of a contract for their construction.
The foregoing statements of the unusual course pursued in the case of this claimant, which it is shown was but one of a number of similar cases, will explain the necessity for the appointment of a commission of inquiry, for the benefit of all parties. Although the commission was in the first instance to inquire only, its powers were subsequently extended, so that its conclusions were recognized by the government as final, and payments were made upon its orders and findings. Creditors of the government upon ascertaining that difficulties were intervening between unauthorized contracts, allowing extravagant prices, and the receipt of money, became anxious for an adjustment of their demands, and availed themselves of the assistance of the commissioners to obtain settlements.
The commission when organized established rules, and in its pro *92 ceedings conformed as nearly as practicable to the usages of courts of justice, and after bearing proofs, decided. The commission did not exercise compulsory, powers, but only heard those who voluntarily sought its assistance, and required that all should take an oath as preliminary to a hearing. Those who did not submit themselves to the authority and inquiry of the commission suffered no loss by the failure to do so. Every redress or remedy which belonged to the creditor before the appointment of the commission remained with him as fully after, as it did prior to its organization.
The United States consented on their part to submit the adjustment of any claims against the government, to the commission, which the creditors on their part might desire to have submitted, agreeing to be bound by the decision.
This claimant, with other creditors, presented his case to the commission for its decision; he took the oath, required as a preliminary step; he was examined in support of his claim; and on the thirteenth of January,’ 1862, appealed to the commission by letter, beseeching it to “ deal liberally with him.” He did not demand a specific sum; he did not insist that his debt was liquidated; he did not deny that his claim was open to dispute, nor the right of the commission to reduce the amount, but he submitted himself to whatever decision it might make.
After a decision had been made, when he desired to receive the benefit of it, and obtained his vouchers for that purpose, he protested against the form of the receipt required for the protection of the government; but'notwithstanding this protest, he subsequently demanded and accepted the money which the commission had allowed, without protest. Suppose the claimant had retained his voucher with the receipt upon it, and had not presented it for payment, his right of recovery would not have been impaired if he could show that duress or other improper means had been used to obtain his signature; or had he declined to give the receipt, if the finding of the commission was not to be binding, as he now insists; his rights and remedies would be as complete now as ever. This court would still have been open to him; and had he chosen to seek a remedy here, the receipt upon the voucher; if he could show that it had been obtained by duress and without consideration, would not defeat a recovery. Had his voucher been withheld from him because of his refusal to sign the receipt, this court is authorized to procure it, or such other evidence from any department where it might be deposited, as would obviate any difficulty in that regard, and almost daily exercises similar authority.
*93 Notwithstanding his protest, the claimant afterwards accepted the money awarded him, with a full knowledge that if he took it at all, it was upon the express condition, that it should be in satisfaction of his whole demand.
He was forewarned, not only by the terms of the receipt, but by the whole action of the commissioners, if he accepted the money, that it was upon the express stipulation that his claim was to be barred forever. The claimant was not laboring under any mistake of law or fact; he had ample time for deliberation; the whole transaction was without any appearance of fraud, and the claimant having made his choice, should be hound by it.
I am aware of the rule of law which declares that the receipt of a part of a debt due, even under an agreement that the same shall be in full satisfaction, is no bar to an action to recover the unpaid balance; hut I think the rule only applies to cases where the claim is for a fixed and liquidated amount, capable of ascertainment by arithmetical calculation, and in no respect open to dispute; but not to a case like that under consideration, arising out of unexecuted contracts, where the right of recovery depends upon a quantum meruit.
In support of the view I take of this ruling, I refer to the following decisions: McGlynn v. Billings, 16th Vermont Reports, 329; McDaniels v. Lapham, 21st Vermont, 222; Same v. Same, 26th Vermont, 230; Wikinson v. Byers, 1st Adolp & Ellis, 106. In the case cited from the 21st Vermont, the case of McGlynnv. Billings is commented upon as follows : “ In that case the plaintiff and defendant met for the purpose of making a settlement, and, having examined their accounts, they disagreed as to the balance due to the plaintiff from the defendant. The defendant then drew an order in favor of the plaintiff upon a third person for the sum he admitted to be due, and offered it to the plaintiff as the balance, his due. The plaintiff refused to receive the order, and claimed a larger sum as being the.amount the defendant owed him. The defendant then gave the order to one Hanley, who was present, and directed Hanley to deliver the order to the plaintiff when he would receive it as the balance due to him. The plaintiff subsequently took the order from Hanley, but at the same time declared that he did not receive it in full for the balance due him from the defendant, and brought his suit to recover the balance. The auditor reported that there was still a clear balance due to the plaintiff above the amount of the order. In that case, this court held that the acceptance of the order by the plaintiff under the circumstances operated as a full discharge of all his claims, although he expressly declared he did *94 not so receive it. And we are satisfied that that case was decided upon correct and established legal principles.” In the casein the 21st Vermont, the court says: “It would seem to follow, as a necessary deduction from this well-established rule,” (a rule in relation to tenders,) “that when the party makes the offer of a certain sum to settle a claim, when the sum in controversy is open and unliquidated, and attaches to his offer the condition that the same, if taken at all, must be received in full or in satisfaction of the claim in dispute, if the other party receive the money he takes it clogged with the condition which the other party has attached to it, and is thus bound by its fulfilment.”
When the boats built by claimant were taken into the possession of the government, his claim for building them was before the Holt-Davis commission, and the agents of the government, if they are presumed to be informed on the subject, might well infer either that the boats had been paid for, or if not, that the claimant would be satisfied with whatever the commission might allow for them.
The boats were useless to the claimant; he was seeking his pay for them, and his delivery of them to some one of the multitude of officers then in existence, should not be held to be a ratification of contracts, of which the officer accepting had probably never heard. A rule which would hold an individual to the ratification of contracts, who acts in his own right, with a full knowledge of their terms and obligations, stimulated all the while by an active personal interest; would be very unjust as applied to the government, which acts always by agents, who are frequently being changed, who are without personal knowledge, and who are presumed to be without pecuniary interest. What is offered to them as public property they accept as such, intending only to receive what is delivered, not pretending to any knowledge of title or obligations, or supposing that they thereby ratify anything.
The reasons which should hold an individual to the affirmance of a contract; are wanting in government transactions. I am unable to find in the act approved December 24, 1861, which is in these words, “ that the sum of one million of dollars be, and the same is hereby, appropriated, out of any money in the treasury not otherwise appropriated, for gunboats on the western rivers,” any recognition by Congress of the transaction involved in this controversy. Gunboats had previously been built on the western waters, and others were then building; the boats built by this claimant wore not gunboats, nor were they so called. The application to Congress for an appropriation to pay for gunboats, &c., based upon the letter of the Quartermaster General, included the boats built by Adams, which were designated in the letter as the *95 “armed flotilla;” but Congress limited tbe appropriation, to tbe payment for gunboats only, omitting entirely all allusion to tbe “ armed flotillahence, if any inference is to be drawn from tbe action of Congress, it is against a recognition, of tbe contracts set up by Adams. Tbe Quartermaster General bad previously repudiated tbe contracts, and had referred all tbe questions connected with them to the commission for settlement; and any appropriation asked for by him could only have been intended to satisfy such sums as tbe commission might award. Adams, if we may judge from bis letter to the commissioners of 19tb of January, 1862, did not expect any relief except through . tbe commission. If Congress designed, by tbe act referred to, to recognize tbe contracts set up by Adams, neither he nor tbe Quartermaster General so understood it. Adams certainly did not, or be would not, twenty days after tbe passage of tbe act, have been appealing to the commissioners to deal liberally with him in regard to them. The relation of tbe act of appropriation above quoted to tbe transaction with this claimant is no more apparent to my mind than it was to his. I do not see any connection between them, and I am not willing to accept a construction of this statute which is not consonant to its letter or intent.
I think that judgment should be for the defendants.